All rise. The Illinois Appellate Court's second division is now in session. The Honorable Justice Margaret S. McBride is to the side. Good morning, everyone. Please be seated. All right, we will call the first and only case we have this morning. Case 1-21-1083, Dugall v. Dowdell-Leverson. All right, the attorneys that are going to argue, please step up to the podium and identify yourselves for the record. Good morning. My name is Kelly Burden and I represent Darrell Leverson from the State Appellate Defender's Office. Good morning. Good morning, Assistant State's Attorney Noah Montague on behalf of the people. Mr. Montague, good morning. All right, before we proceed, I will let each of you know that you're going to have about 15-20 minutes 15 minutes for your presentation. From that, Burden, you may save out some time for rebuttal. All right? Please be seated. And, Ms. Burden, you may proceed. I didn't really introduce the judges, but sitting on the panel are myself, Justice House, and Justice Ellis. Good morning. Good morning. May it please the Court, I'd like to reserve five minutes for rebuttal. All right. This morning, I would like to address the first two issues in Mr. Leverson's brief, and I'd be happy to answer any questions about the third issue in his brief if the Court has any questions on that issue. There are two issues before the Court today. Darrell Leverson's statement should have been suppressed because the officers violated his Miranda rights. It also should have been suppressed because it was involuntary. Nineteen-year-old Darrell Leverson was taken into custody in the Dalton Police Department. He was held for 72 hours. He was interrogated by the police for seven times before he gave an inculpatory statement. Over those 72 hours, Mr. Leverson unequivocally invoked his right to counsel five times. He asked for a phone call over 20 times before he was granted a phone call. And are all those requests on an electronic recording? Yes. The State does not condone or excuse the officer's misconduct in this case. And that's quite understandable. With respect to Miranda, Leverson's request for counsel was either ignored every time or he was responded to with threats. For example, after the fifth interrogation where Mr. Leverson unequivocally invoked counsel and the interrogation stopped, the officers admitted that when they walked him back to the holding cell, they told him if he didn't talk, he was going to wind up being the shooter. The officers also lied to him. Why most of the evidence suggests that it was one of the co-defendants that was actually handling the gun for the most part? Kevin Eason, who was also charged but not tried with him. Mr. Leverson was told, it was not, with respect to his Miranda rights, was also told at one point by Detective Hope that he was not important enough to get a lawyer at the police station. Now the State claims that Mr. Leverson voluntarily reinitiated contact with the police for the seventh interrogation. But Mr. Leverson's request to reinitiate and talk with the police cannot be viewed in a vacuum here. After some 60 hours of in custody, after having previously invoked his right to counsel, after the fifth interrogation, the officers woke Mr. Leverson up at 4 a.m. and they interrogated him for a sixth time. The police at this point ratcheted up the pressure on 19-year-old Darryl Leverson. They told him they were going to bring back the death penalty for him. They told him he was never going to hold his two-month-old son again. They threatened him, taunted him with his likelihood of facing sexual violence in prison. From the video you can see the two detectives physically surround him and get closer to him and they get in his face and they yell at him and they swear at him and they tell him he's going to prison forever. That interrogation ends with Mr. Leverson quivering three times, I want a lawyer. Against this backdrop, the State argues that some four hours later, Mr. Leverson decided to re-initiate contact with the police officers. There is no case in this State or any other State that holds, after such egregious mistreatment by police, an individual voluntarily re-initiated contact with the police. For the same reasons that he did not re-initiate contact, he did not validly waive his rights to Miranda. Because the statement was also involuntary for much of the same factors. There's a lot of overlap between the factors in this case. Mr. Leverson was essentially held in isolation incommunicado. The police officers conditioned his right to a phone call to the police with his cooperation. Just as the Solomon Court, the Illinois Supreme Court, commented on how police officers are not allowed to do that, to condition the statutory right to a phone call, because that's your only way to really exercise your right to counsel. In this case, Mr. Leverson repeatedly asked for a phone call. He was not allowed a phone call until some 20 hours into the interrogation process.  20 hours. So if your position is clearly that there was a Miranda violation, the statement was involuntary, the judge erred, are you going to talk about the State's fallback harmless error? Sure, yes. Would you like me to address that? Well, I think you'd all like to hear that. Oh, certainly. Okay. In this case, it's clear Mr. Leverson's constitutional rights were violated, and the State really doesn't meaningfully dispute that in their response. This error cannot be deemed to be harmless beyond a reasonable doubt. The State has the burden of showing that this error was harmless. Under any of the approaches that this Court would employ to determine whether an error is harmless, the State fails at each of them. First, we know the jury considered this confession because an hour into their deliberation they asked the Court for a transcript of the confession. So the 41-page confession went back to the jury room. We know the jury focused on it, and the State focused on it. The State focused on it in their closing argument where they stopped the video recording of his statement four separate times and referred to it in their argument to explain to the jury how Mr. Leverson was guilty under an accountability theory. We also know that this evidence that the State used was not duplicative. There were no other inculpatory statements of Mr. Leverson admitted at trial. So this was the case. This was a little different than the Solomon case, wouldn't you agree? Yes, Your Honor. In that case, the Solomon, there was another confession from a friend who was 15-year friend of the defendant who Mr. Solomon gave a confession to that came in that was essentially duplicated everything that the defendant in that case gave to the officers in his statement. So in this case, there's no other statement that came in. This was the only statement. Were there eyewitnesses in Solomon? There were eyewitnesses in Solomon that put him at the scene at the bar. What do you think that the Supreme Court meant when they said it's in the rarest of cases that an involuntary confession could result or you could have harmless error in that sort of situation? I believe it's because it's in recognition of just how powerful a statement is, a statement against your own interests. And in this case, it's demonstrated by how the State talked about it again and again and again in the closing argument. It is a powerful piece of evidence. And when it's used against you, your own words, other evidence just really is not duplicative unless it's like another statement where you implicate yourself to a good friend. So I think what the Supreme Court meant is that understanding how powerful and damning this type of evidence is, it's going to be very rare to a defendant to say you can violate his constitutional rights and then use this statement but it's harmless. Well, did they examine the evidence? In Solomon, they examined the evidence, yes. So are you going to talk about the depth of the evidence that was in this case and why it's not harmless? Yes. In this case, there were eight victims, eight separate crimes, eight complaining witnesses. Not one of them ID'd him in court. Two of them gave out-of-court identifications, but those were problematic for the State as well. So there was, with respect to the identification evidence, that was weak in this case. The State needed the statement of Mr. Leverson. It was the glue to the case to hold it together. Because this was a crime spree or a series of crimes that happened so quickly together, the State really relied on the inferences of guilt for him being there, being present, and they used the statement in three different ways. They used it as an M.O. So they talked about it in closing argument. So for the complaining witnesses who did not identify Mr. Leverson, they used the line in his interrogation where he explained that it took two people to commit these crimes, Kevin Eason, who, as Justice McBride pointed out, was the ringleader, who was the driver. Well, I didn't point that out. I said he was the one that was identified or was not. And that was the State's theory was that Kevin Eason was the driver and that two would get out of the car, Kevin Eason and someone else. For four of the crimes, there was a third defendant in the car, Eddie Fleming, who was tried with a simultaneous severed jury with Mr. Leverson. But the State's theory was that there were two people, and all of the complaining witnesses essentially testified that there were two people. So when they identified Mr. Leverson, I'm sorry, Mr. Eason as the driver and the gunman, and five of the complaining witnesses were able to identify Mr. Eason, the State argued that Mr. Leverson and him were like this. They said the two of them were together. Because in his statement, he put himself with Kevin Eason. So they used it to show not just his presence. They used it to show his participation. And they played it back with respect to three separate crimes. They played it back to the jury when they talked about the first crime, the armed robbery. Isn't there, though, some substantial evidence here? Regardless of the eyewitnesses, you've got DNA. There's fingerprints. You've got DNA on a, what do you call it? Airbag. Yeah, an airbag. And then there was DNA on the gun. And then where were the fingerprints? Fingerprints on a water bottle in the Jeep that was found the day after. Right. But the Jeep was the beginning of it, or used at the beginning. But he was in the Jeep at the time, right? He had been in the Jeep. Yes. He was in the Jeep when. . . The day after the crime, he was in the Jeep with others. Yes. They chased the Jeep. Yes. And he got out. And he got out, yes. That's when they found the one. Correct. Yes. But as this Court pointed out in the Coleman case, which is cited in the brief, and interestingly enough, Detective Daryl Holt is named in that as one of the detectives that violated that defendant's Miranda rights as well. In that case, the Court noted that the evidence was substantial. So that's not the standard here. This is not a sufficiency argument. This is whether or not the State can prove. The burden is on them. And we're not looking at it in the light most favorable to the State. We're saying, can the State prove beyond a reasonable doubt that the verdicts of the jury would have been the same without this statement? And the State just cannot meet their burden in this case because the evidence was weak. The identification witnesses, there were no in-court identifications. There were, as I said earlier, only two people who had out-of-court identifications, and both of them were undermined at trial. One of them, Mr. Harris, the first crime armed robber, denied making the statement to the police officers and said that they told him he had to make an identification if he wanted his property back. And that's the problem when officers engage in misconduct like that. It makes an argument like that quite plausible in that case. With respect to the other witness, Mr. Willie Douglas, armed robbery victim, who identified in a photo array Mr. Leverson some 20 days after the crime, his identification out of court was undercut by his admission at trial that right after the armed robbery, he told the police he didn't get a good look at the passenger because the gunman, arguably Mr. Eason, pulled him out of the car and made him lay face down. So he said he told the police he did not get a good look at the passenger of the vehicle. So those identifications the state had were very weak. They needed this statement. It was the glue that held the house of cards together for the state, and they relied on the statement. We know they relied on it because they pounced on it in closing argument, and we know the jury focused on it because the jury asked for the statement. So what do you make of the airbag DNA? Like, what could you – what inference could you draw? It puts him in the car when the car crashes. It puts him in the car when the car crashes, certainly. So what about before that? So the state would say that the crime, the armed robbery that preceded the crash, the car chase, which seems like it was pretty close in time, I think that would be Philip Neal, right? Philip Neal. That the state would have us accept that those two things happened so close in time that it's all but an obvious inference that he must have been in the car for the Philip Neal robbery as well. Well, and again, as the Coleman said, the evidence can be substantial. But again, taking it back, is it beyond a reasonable doubt? But also with respect to that question, what I would say is that there was – during this series of crimes, people were popping in and out of the cars. Eddie Fleming was there. There was also a lot of identifications of other people as being – having been shorter – sorry, taller than Mr. Levers – than Mr. Eason. Excuse me. Mr. Eason was about 5'4". Daryl Fleming was 5'7", and my client was 6". So a lot of the identification was that they were taller than Mr. Eason, who was a little bit shorter. So the evidence that they had – now, with respect to – you know, people were jumping in and out of the cars. And so – and the timeline between that last crime and the call is off by 10 minutes, because the police officer said they responded at 1230, and the crime victim said it was about 1240. So there's some error. And these young men were driving all about town, circulating, and people were jumping in and out. So certainly, Mr. Leverson, there was no other evidence that tied him to the last crime, which would have been Mr. Neal. And Mr. Neal identified Mr. Eason out of court, and interestingly, in court, misidentified the co-defendant, Eddie Fleming, as Mr. Eason. So that had nothing to do with my client, only to show the weakness of the identification testimony. But there was no identification by Mr. Neal of the last crime of my client, Mr. Leverson. So because we know the state relied on this statement, they used the statement. There was no other evidence, no other inculpatory statement. There's no other evidence that was duplicative of this evidence. The DNA evidence, all those other – all the other evidence didn't duplicate. I think it's the best illustration of how this was not harmless, is looking at the most serious charge that my client was convicted of, and that was the murder of Mr. Hampton. Is substantial evidence the same thing as overwhelming evidence? That's a good question. I don't think that the state – I think that substantial just also means that – I think when the court's looking at the overwhelming evidence, it's looking at the direct evidence. You know, there was substantial – circumstantial evidence, also looking at the different sources of the evidence. So with respect to – I think overwhelming is a much higher burden than substantial evidence. But substantial evidence is acknowledging that there was some evidence against the client, and probably in a sufficiency case, you know, enough to survive the lower burden that the state faces. But again, in this case, the state faces the very high burden of proving beyond a reasonable doubt that this statement did not – did not contribute to the conviction. And with respect to – I was talking about Mr. Hampton's murder. Murder, that was the most serious crime. Mr. Leverson was sentenced to 42 years for that crime. There were no eyewitnesses in that case, and there was no physical evidence on the scene that was directly linking Mr. Leverson to that. The state would not have been able to get a conviction for a first-degree murder without Mr. Leverson's statement. And they knew that, and they played that part of the statement. And they argued to the jury the theory of accountability, the jury instructions. They said, because Mr. Leverson admitted to getting out of the car and agreeing to help rob Mr. Hampton. And then he heard Kevin Easton fire the shots, and he was running back to the car. And the state argued to the jury that was inconsequential, whether or not Mr. Leverson was running back to the car, because this was an accountability theory. So they used his statement for the most serious crime for which he was convicted. So this use of this evidence cannot be deemed to be harmless. If the exclusionary rule is going to have any deterrent effect at all, this is the case for that. The officers' conduct was egregious. It was serial. The state does not seriously, does not condone or defend the officers' conduct. And in this case, it just was not harmless. So what Mr. Leverson is asking this Court to do is to reverse and remand for a new trial, where the state can use the evidence, accept the confession against him for a new trial. And alternatively, if this Court does not do that, Mr. Leverson is asked that this Court remand for a new sentencing hearing or reduce his sentence. All right. And you'll have some time for your vote. Thank you. Mr. Montague. Good morning. May it please the Court. Assistant State's Attorney Noah Montague on behalf of the people in this matter. Your Honor, the facts in this case are voluminous, and they're well known to the Court. So I won't spend much time on them. I would just point out a few things. The counsel did note that this case involves eight offenses, one of which is murder and the other seven of which are all class X felonies. And there are two cars that are important in the facts of this case. There's the Jeep Liberty, which the first several crimes were committed with, and then there is Robert Hopkins' Lexus. The Jeep was used to drive to Robert Hopkins' house. Robert Hopkins' car was carjacked. And from that point on, a few other offenses were committed where the Lexus was identified as the car that the offenders got out of. And this is important in a number of respects because of evidence in this case, which a lot of this case is circumstantial and ties together. But it's also important because, as Your Honor noted, that one of the offenses was committed and that Lexus was seen almost immediately after. And a chase ensued. The chase ended in a crash. Two people ran from the car, and defendant's DNA was found on the airbag. And then the murder weapon was also found in the car, and defendant's DNA was also found on the murder weapon. Counsel, how do you convict him of the Jeep-related crimes without the confession? So by that, just to be clear, I'm talking about the robbery of Greg Harris, right?  The murder of Hampton, the robbery of Revetta Moore, and then I guess all the way up to the carjacking because the Jeep was there too. How do you convict Leverson of any of those crimes without the confession? I mean, this case has one agreement, which counsel noted, is that the State finds what the police did here indefensible. We're not here to say in any way that screaming at someone that you're going to bring the death penalty back for them is any way defensible. So what we also disagree on is... Why is this then one of the rarest cases where? Well, Your Honor, I noted actually that you brought that up, and the reason I think it's important in this case is because you look at, if I'm remembering the same sentence in Solomon that you're remembering, I believe the sentence said, it's only the rarest of cases because of the probity of a confession. And the State used the confession quite a bit in this case, and it was in the closing, and there were at least four references, and so, yeah, the probity is significant. But the problem here of what the State sees when the State, you know, obviously I didn't try the case, but looking at this whole record, when you look at the transcript of the defendant's confession, the question becomes probative of what? What did he actually admit to? And I fully acknowledge that the State made some sort of argument out of it at closing, but he admitted to Greg Harris' robbery. He admitted to being part of the car when Greg Harris was murdered. Was he admitted to being a part of the carjacking? Actually, I believe with the carjacking, he said he wasn't even there. No, he didn't. He was in the Jeep. He drove the Jeep away. Oh, I'm sorry. He said he went home or something like that. At that point, he kind of loses his memory about what happened and just says, I was there until the end when the car crashed. But talking about the Jeep, which is actually the question I asked. Yes. Listen, Counselor, you have a tough job here today. We all get that. But how do you convict him of these Jeep-related crimes of Harris and Hampton and Roberta Moore and the carjackings without the confession? I mean, what evidence do you have? One thing I see in this case is having dealt with accountability cases before, Illinois consistently says mere presence is not enough to convict. So when I look at this case and I see defendants saying they told me and forced me to get out of the car. But he's not talking about mere presence. He took the coat off of Greg Harris. He took his coat off of him. And he got out of the car for Derek Hampton. Yes, he changed his mind, but I don't think the law lets him off the hook if he has second thoughts once he's there. Okay. Well, you tell me. He's still accountable for that murder. That's true, isn't he? I don't see it. Because when you look at the forms of doing it, you either have to have more or less a specific intent or a common design. Well, isn't that what you argued at trial? Not you, Mr. Montague. But your prosecutor at trial said that's all you needed to show. They said it over and over again, and now we're about to close. They kept stopping the video, like Counsel said, and said, see, that's all. They even said to the jury, we don't think that Leverson shot the guy. I don't think he did, said the prosecutor. But he was there, and it doesn't matter that he tried to walk him back. So if you're saying that's not the law, are you telling me you guys were misstating the law to the jury? I don't think that was a misstatement of the law. Well, I don't see how you can convict someone on common design just by someone saying, what are you still doing in the car, and the person saying, okay, and stepping out, seeing the gun and saying, whoa, I'm going back in the car. I don't see how you can logically get, dude, that person had a common design to do anything. Does that mean we should reverse the conviction for murder outright? No. The thing is that you're saying there wasn't enough proof. If the confession doesn't stand, should the murder be reversed outright, or should it be remanded for a new trial? No, it should not be reversed outright. The murder should be a term. And, you know, counsel is very dismissive of that idea. Counsel, I'm sorry. This is turning into a bit of a bizarre interchange we're having here. I thought you were going to try to convince us that without the confession you had strong evidence of guilt, and you seem to be downplaying what you had. Like, what proof did you have convicting him of murder without the confession? Okay. The murder is shown by a few things. Okay. First, the fact that Gregory Harris identified him. And as I was saying, you can be dismissive of that identification, but under Illinois law, Illinois law has a long history where people identify someone, then come to court, and they back off. Sure. That identification in its own handwriting and signed and witnessed by multiple people who testified that he actually did it and he wasn't forced to do it is substantive evidence of guilt for that robbery. Okay. Now, what you have then, though, is you have a couple things. One, Gregory Harris said the defendant got back in the passenger seat of the car. And then only a minute later, I believe, you have the cameras, the videos showing the Jeep and showing someone get out of the passenger car, the side of the car.  And then you have defendant's ENA on the murder weapon. Now, that is a circle of circumstantial evidence around defendant. But Gregory Harris, all by himself, puts defendant on the scene of that murder and puts him out on the ground during that murder. And, again, what are you to make of the fact that his ENA is on the murder weapon? Is that just to be ignored? I think that's extremely appropriate evidence of guilt. You know, what I'm struggling with, I agree with you. This evidence is sufficient to sustain the conviction. But aren't we looking at a different standard here where we're determining whether or not this confession contributed to this conviction? Don't we have to look for overwhelming evidence? Yes. You know, it's sufficient. But just because he was identified in a shaky idea a few minutes earlier, does that overwhelm me beyond the reason why I say he was participating in that murder?  The way I see it is this. Consider the litany of evidence that still comes in if this case is retried. Because if the case is retried, you still have his DNA on the murder weapon. You still have the DNA on the Robert Hopkins Lexus' airbag. You still have his fingerprints inside the Jeep. You still have his identification as the person who robbed the McDouglas. You still have his identification as the person who robbed Gregory Harris. You still have the surveillance video, as I said. How can we, though, really discern that the jury didn't take those statements that he made and say that had nothing to do with the convictions? How can we possibly really say that? I don't read the law on harmlessness as requiring this court to sort of get into the mind. No, but we have to conclude that the state is, number one, if we find it's involuntary or if we find it's a violation of morality. But let's take the involuntary. If we find that it's involuntary, then it's your burden to prove beyond a reasonable doubt that that confession did not result in those multiple convictions. And, you know, the way I think you get there is by looking at just how much evidence there is of this defendant's guilt without the statement. And, you know, when you continue to look at it. Well, give us a comparable case where we have this history in terms of how the statement was given. Mm-hmm. Macias was really the only one. Pardon me? People v. Macias was the only one the state could find that was really comparable. I mean, there aren't many comparable cases, thankfully. Yeah, because it's only in the rarest of cases that we would ignore what preceded the confession. Who was the one that says he wants to talk now? Who was that witness? That witness before the seventh interview where he actually gave his statement?  Were there seven interviews in Macias? No, no, I don't think so. No. Was there five? I don't remember the exact number. Were there three? No. I don't know that there's anything like the facts in this case in all of the books. So the person who heard him say that he wanted to reinitiate the talks was just a person, one of the officers at the police station was just doing rounds in the whole, I don't remember the person's name. Well, you have to concede the state used the confession in the closing, don't you? Certainly. Okay. Well, I don't know. I guess I'm still looking for how do we, how can we conclude that the state demonstrated beyond a reason that this confession had nothing to do with the guilty findings? Well, the state, as we see it, is, says that you can do that from two things. It's that his denial and minimization of his role in all these offenses, and then the long list of evidence that there is. What do you mean by his denials? What are we supposed to do with that? Well, that goes back to what the court was saying in Solomon, and it's only the rarest of cases because of the probity of the confession. But if the confession isn't probative of his guilt, well, then you don't have as much of a doubt. So the jury took the denials and, you know, as just another person trying to get out from under? Well, I mean, the jury had to. You don't think that the jury could have thought that his statements that were in were, you know, lies, trying to get out from under? I mean, certainly it's the state's view that his statement was not honest. Sure, and maybe the jury thought the same thing. I'm trying to get to this beyond a reasonable doubt that the statement didn't contribute to his conviction. Right. And, well, I mean, in the statement he denies most, not all, but most of the offenses. And then in the physical evidence places him on the scene at these offenses, places him doing things at these offenses. And then, you know, consider one other piece of evidence. You have the surveillance video from the SICCO station. And, you know, you have Kevin Eason clearly identified on that. But then you have someone significantly taller than Kevin Eason. And you have the fact that, you know, Leverson is six feet tall. And the people consistently identified one shorter, one taller. People consistently identified the gun, which, again, the gun had his DNA on it. People consistently identified both of these cars, which, again, he had his DNA on the one car. And he has fingerprints on the other. And so we only have, you know, two identifications on this list. But, you know, as I said, there's strong circumstantial evidence that his fingerprints were found in the Jeep the day after. And he was in the Jeep the day after. Sure. Presumably with that water bottle. True. And that doesn't put him at the wrong seat with the Jeep. No. Gregory Harris's identification in the surveillance video does. So if there are no more questions, it is the State's position in this case that it is harmless beyond a reasonable doubt. Because of the fact that, you know, if this is sent back for retrial, all this litany of evidence is going to come right back in. Except you're not going to have the statement where the only thing in the statement are a couple points where he said, yeah, I got out of the car and I didn't do anything. Or I got out of the car and I grabbed the coat because they made me do it. You know, it's the State's position. But that's not the same thing as saying I don't know those guys and I had nothing to do with them. True. That's true. Okay. Well, for these reasons, we would ask you to affirm this conviction. Thank you very much.  Ms. Berger? Just briefly, Your Honors, I would like to touch upon the State's reliance upon the Macias case. In the Macias case, this Court found that the statement was not coerced because at that point, the officers had showed the defendant a video of a co-defendant implicating him. So they determined that even though the officer's conduct was inappropriate, that the actual inducement of the statement was that he learned of a co-defendant naming him. In this case, there's nothing else that induced the statement other than the officers' egregious threats in the sixth interrogation where they broke Mr. Leverson's will. With respect to the evidence in this case, it's important to point out while there was DNA on the gun, Mr. Leverson's DNA on the gun, the State's expert testified at trial. They have no idea when that DNA was placed on that gun. So it could have been on there any time. So that alone, that evidence would not have been enough to support the conviction. No, the State isn't arguing that that one singular piece of evidence is, though. No, but with respect to the murder of Mr. Hampton, in some, the State did use this unconstitutionally obtained statement against my client, and they used it really in three ways. They used it to show his presence for everything and allow the jury to create an inference of his presence in that he was in the Jeep and he was in the Lexus at the beginning and the end. They used it to implicate him in participation directly in three crimes that he spoke of, and they also used it as a catch-all when he spoke about there being an M.O. that one person would get out with the gun and the other person would go through the pockets. So that filled in the gaps in the State's case. So the State used this confession, and it was the use of it was not harmless. So we ask that this Court reverse Mr. Lutterson's convictions and remand for a new trial where the statement cannot be used against him. All right. Thank you both. The case will be taken under five minutes. Court is adjourned.